UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 12 CIV 7688

HALLMARK AVIATION LIMITED,

        Plaintiff,

v.

AWAS AVIATION SERVICES, INC. f/k/a
PEGASUS AVIATION FINANCE
COMPANY,

        Defendant.

CIVIL ACTION NO.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
OCT 15 2012
U.S.D.C.S.
CASHIERS

Plaintiff Hallmark Aviation Limited, by and through its attorneys, Drinker Biddle & Reath LLP, by way of its Complaint against defendant AWAS Aviation Services, Inc. f/k/a Pegasus Aviation Finance Company alleges as follows:

### NATURE OF THE ACTION

1.    This action for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and tortious interference with existing business relations arises as a result of Defendant's wrongful circumvention of a commission agreement entered into by the parties.  Defendant's wrongful conduct reflects an effort to avoid paying an introducing broker's fee to Plaintiff in connection with the sale of a Boeing 787 to a third-party.

### THE PARTIES

2.    Plaintiff Hallmark Aviation Limited ("Plaintiff" or "Hallmark") is a corporation organized and existing under the laws of the State of Maryland having its principal place of business at 6069 Watch Chain Way, Columbia, Maryland 21044.

3.    Upon information and belief, defendant AWAS Aviation Services, Inc. f/k/a Pegasus Aviation Finance Company ("Defendant" or "AWAS") is a corporation organized and

existing under the laws of the State of New York, having a principal place of business at 444

Madison Avenue, 4th Floor, New York, New York 10020. Upon information and belief, in June

2007, AWAS purchased Pegasus Aviation Finance Company ("Pegasus").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this matter under 28 U.S.C. §1332(a)(2) in that

there exists complete diversity of citizenship between the parties and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

5.      Venue properly lies in this district pursuant to the agreement of the parties.

6.      Venue also properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7.      Plaintiff is an independent aircraft brokerage firm. Stephen P. Hall ("Hall") is the

President and Chief Executive Officer of Hallmark.

8.      Plaintiff is generally in the business of locating and brokering the purchase and

sale of high valued aircraft. The market for aircraft of this type is extremely small. Due to the

difficult nature of the business, it is necessary to use all available contacts to locate suitable

buyers and sellers for aircraft that sell for tens of millions of dollars. It is standard practice in the

industry to pay introducing broker fees.

9.      On or about July 14, 2006, AWAS's predecessor Pegasus entered into a purchase

agreement with The Boeing Company ("Boeing") for the purchase of Boeing Model 787-8GQ

("Boeing Purchase Agreement").

10.     In or about May 2006, Alireza Ittihadieh of Freestream Aircraft Limited

("Freestream"), another aircraft broker, approached Hall to determine if he had any contacts that

would be willing to sell a delivery position for a new Boeing 787 Dreamliner.  Mr. Ittihadieh's client, SWIRU Holding AG ("SWIRU") was interested in purchasing a new Boeing 787 Dreamliner.

11.     Using his contacts within the industry, Hall contacted, among others, Pegasus to inquire whether they had a delivery position for a new Boeing 787 Dreamliner and whether they were interested in selling that position.

12.     As a result of Hall's contact and Hallmark's reputation within the industry for completing this particular type of transaction, Pegasus indicated that it had entered into the Boeing Purchase Agreement for a Boeing Model 787-8GQ and was willing to assign its rights under the Boeing Purchase Agreement.

13.     Plaintiff then introduced Pegasus to SWIRU's representative, Freestream.

14.     On September 15, 2006, in connection with the negotiations between Pegasus and Freestream on behalf of SWIRU, SWIRU deposited $5 million into escrow as security.

15.     On or about October 6, 2006, as a result of Plaintiff's efforts, Pegasus entered into a letter agreement with Freestream on behalf of SWIRU (the "SWIRU Letter Agreement"), wherein Pegasus offered to sell and SWIRU agreed to purchase a Boeing Model 787-8GQ aircraft in "green configuration (the "Aircraft").  The parties agreed to enter into a definitive purchase agreement at a later date.

16.     On October 30, 2006, Plaintiff executed a commission agreement with Pegasus (the "Hallmark Commission Agreement").  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

17.     Pursuant to the Hallmark Commission Agreement, Hallmark is entitled to a sales

3

commission of three quarters of one percent (0.75%) of the sales price paid by SWIRU to Pegasus for the Aircraft. *See* Hallmark Commission Agreement, ¶ 3.

18.    The Hallmark Commission Agreement contemplates that the commission to Hallmark would be paid in two installments. The first installment was due upon execution of the purchase documentation and receipt of the security deposit. The second and final installment was due "upon closing, receipt of payment in full by Pegasus and physical delivery of the Aircraft to SWIRU . . . ." *See id.*

19.    Hallmark received the first installment of its sales commission in November 2007.

20.    On or about December 7, 2006, SWIRU placed an additional $5 million security deposit into escrow, bringing the total amount of the non-refundable security deposit in escrow to $10 million.

21.    On or about December 21, 2006, as a result of Plaintiff's efforts, Pegasus entered into an agreement with, *inter alia*, SWIRU, wherein Pegasus assigned its right to purchase the Aircraft from Boeing to SWIRU (the "SWIRU Purchase Agreement").

22.    Although executed in 2006, the SWIRU Purchase Agreement contemplated that delivery of the Aircraft would take place at a future date after Boeing rolled out the 787 Dreamliner.

23.    Upon information and belief, Pegasus anticipated that its profit from the SWIRU Purchase Agreement would be $17 million.

24.    Upon information and belief, at all relevant times, Boeing encountered significant problems and delays in rolling out the Boeing 787 Dreamliner. Among other issues, the Boeing 787 Dreamliner was being produced at a significant loss to Boeing. Boeing used the delays and

4

threats by customers to cancel contracts as an opportunity to modify existing Boeing 787 Dreamliner sales agreements to exchange the Boeing 787 Dreamliner for other more profitable Boeing aircraft.  Boeing gave significant discounts to its existing contractual counterparties as incentive to switch to these other more profitable Boeing aircraft.

25.     In April 2012, Plaintiff learned that SWIRU had declined to purchase the Aircraft due to delays at Boeing.

26.     Upon information and belief, AWAS, which had since purchased Pegasus, refused to terminate the SWIRU Purchase Agreement unless AWAS recovered, at minimum, its $17 million in anticipated profit.

27.     Upon information and belief, AWAS retained the non-refundable $10 million security deposit from SWIRU.

28.     Upon information and belief, AWAS simultaneously entered into a second aircraft purchase transaction with Boeing to provide AWAS with, at minimum, an additional $7 million in profit to satisfy the original anticipated profit of $17 million.

29.     Upon information and belief, AWAS structured the cancellation of the SWIRU Purchase Agreement so as to circumvent the Hallmark Commission Agreement and obtain an additional profit from Boeing.

30.     Upon information and belief, despite the fact that there had been no physical delivery of the Aircraft, AWAS received the full benefit of its bargain under the SWIRU Purchase Agreement.

31.     But for Hallmark's facilitation in introducing AWAS to SWIRU, AWAS would not have received the full benefit of its bargain under the SWIRU Purchase Agreement.

5

32.     On or about April 20, 2012, Hall had a telephone conversation with Phil Jackmauh, EVP of Legal Services for AWAS to demand full payment of Hallmark's sales commission.

33.     On April 25, 2012, Hall sent a letter to AWAS demanding full payment of Hallmark's sales commission and indicating that the supervening actions of AWAS with SWIRU and Boeing accelerated the date for payment in full to Hallmark ("April 25, 2012 Hallmark Letter"). Hall indicated that Plaintiff has established international clientele that seek to purchase high value aircraft and that, had AWAS raised SWIRU's attempted cancellation of the SWIRU Purchase Agreement with Plaintiff, Plaintiff may have been able to save the original transaction and/or structure a different purchaser. A true and correct copy of the April 25, 2012 Hallmark Letter is attached hereto as **Exhibit B**.

34.     On May 30, 2012, after receiving no reply to the April 25, 2012 Hallmark Letter, Hall again called Mr. Jackmauh to demand payment. AWAS refused to make payment.

35.     On June 21, 2012, Hall sent a second letter to AWAS demanding full payment of Hallmark's sales commission based on the fact that AWAS had, through its wrongful actions, structured the cancellation of the SWIRU Purchase Agreement in such a way as to receive the full benefit of the bargain for itself, thereby mooting the requirement of physical delivery of the Aircraft ("June 21, 2012 Hallmark Letter"). A true and correct copy of the June 21, 2012 Hallmark Letter is attached hereto as **Exhibit C**.

36.     On July 2, 2012, Mr. Jackmauh e-mailed Hall that he would receive a letter from AWAS within a few days.

37.     On July 10, 2012, AWAS sent a letter to Plaintiff indicating AWAS's position

NY01/ 7282702.2

that no further payment to Plaintiff was due based on the absence of physical delivery of the Aircraft ("July 10, 2012 AWAS Letter").  A true and correct copy of the July 10, 2012 AWAS Letter is attached hereto as **Exhibit D**.

38.     Despite demand, to date, AWAS has refused to pay Plaintiff its rightful sales commission in an amount to be determined at trial, but in no case less than $369,375.

39.     As a result of the foregoing, Plaintiff has been injured.

**COUNT ONE**
**(Breach of Contract)**

40.     Paragraphs 1-39 of the Complaint are incorporated by reference as if set forth fully herein.

41.     The parties entered into a valid, enforceable, and binding contract ("Commission Agreement").

42.     Pursuant to the Commission Agreement, AWAS was required to pay Hallmark a sales commission of three quarters of one percent (0.75%) of the sales price paid by SWIRU for the Aircraft purchased by SWIRU from AWAS.

43.     AWAS did not perform its obligations under the Commission Agreement.

44.     Plaintiff performed its obligations under the Commission Agreement.

45.     By its conduct as alleged above, AWAS breached the Commission Agreement and as a result, Plaintiff has been injured.

46.     Plaintiff has suffered damages in an amount to be determined at trial, but in no case less than $369,375, as a result of AWAS's breach of contract.

7

## COUNT TWO
### (Breach of the Covenant of Good Faith and Fair Dealing)

47.     Paragraphs 1-46 of the Complaint are incorporated by reference as if set forth fully herein.

48.     Under New York law, implicit in every contract is a covenant of good faith and fair dealing.

49.     At all times, AWAS had a duty to act in good faith and to deal fairly with Plaintiff.

50.     AWAS intentionally and deliberately attempted to circumvent the commission payments due to Plaintiff pursuant to the Hallmark Commission Agreement.

51.     By attempting to circumvent the commission payments due to Plaintiff pursuant to the Hallmark Commission Agreement, AWAS deprived Plaintiff of its reasonable expectations and benefits under the agreement.

52.     By its conduct as alleged above, AWAS breached the covenant of good faith and fair dealing and, as a result, Plaintiff has been injured.

53.     Plaintiff has suffered damages in an amount to be determined at trial, but in no case less than $369,375, as a result of AWAS's breach of the covenant of good faith and fair dealing.

## COUNT THREE
### (Unjust Enrichment)

54.     Paragraphs 1-53 of the Complaint are incorporated by reference as if set forth fully herein.

55.     By introducing SWIRU to AWAS and facilitating a deal between the parties,

8

Plaintiff conferred a material benefit upon AWAS.

56.     The material benefit conferred upon AWAS was at Plaintiff's expense.

57.     Plaintiff has not been compensated for the material benefit they conferred upon AWAS and AWAS has been unjustly enriched.

58.     Equity and good conscience require AWAS to pay Plaintiff for its introduction of SWIRU to AWAS in an amount to be determined at trial, but in no case less than $369,375.

<u>**COUNT FOUR**</u>
**(Tortious Interference with Existing Business Relations)**

59.     Paragraphs 1-58 of the Complaint are incorporated by reference as if set forth fully herein.

60.     At all relevant times, Plaintiff maintained existing business relationships with non-parties Freestream and SWIRU.

61.     AWAS interfered with Plaintiff's existing business relationships with Freestream and SWIRU by terminating the SWIRU Purchase Agreement in such a way as to circumvent AWAS's obligations to Hallmark pursuant to the Hallmark Commission.

62.     AWAS interfered with Plaintiff's business relationships with Freestream and SWIRU through wrongful means and/or with the sole purpose of harming Plaintiff.

63.     By its conduct as alleged above, AWAS's tortiously interfered with Plaintiff's existing business relationships with Freestream and SWIRU as a result, Plaintiff has been injured.

64.     Plaintiff has suffered damages in an amount to be determined at trial, but in no case less than $369,375, as a result of AWAS's tortious interference with Plaintiff's existing

9

business relationships.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant AWAS and requests the Court order payment of actual damages, special damages, and any and all other damages available to Plaintiff, in an amount to be determined at trial, but in no case less than $369,375, plus pre-judgment and post-judgment interest, attorney's fees, costs and expenses, and such other and further relief as the Court may deem proper.

Dated: October 12, 2012

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: _____

Michael O. Adelman
michael.adelman@dbr.com
1177 Avenue of the Americas
41st Floor
New York, New York 10036
Phone: 212-248-3140
Fax: 212-248-3141

*Attorneys for Plaintiff*
*Hallmark Aviation Limited*

# EXHIBIT A

10/30/2006

# COMMISSION AGREEMENT

This COMMISSION AGREEMENT (hereinafter the "AGREEMENT") is entered into this day of October 30, 2006, (the "Effective Date") by and between HALLMARK AVIATION LIMITED (hereinafter "HALLMARK"), a Maryland corporation, with its principal office at 6069 Watch Chain Way, Columbia, Maryland 21044-4715, U.S.A., Telephone Number: (410) 740-0200, Facsimile Number: (410) 740-0202, Attention: Stephen P. Hall, President, and PEGASUS AVIATION FINANCE COMPANY (hereinafter "PEGASUS"), a Delaware corporation, with its principal address at Four Embarcadero Center, 35th Floor, San Francisco, CA 94111, U.S.A., Telephone Number: (415) 434-3900, Facsimile Number: (415) 434-3917, Attention: General Counsel. PEGASUS hereby appoints HALLMARK to act as PEGASUS' sales agent regarding the sale of one (1) Boeing 787 Dreamliner (hereinafter the "AIRCRAFT") to SWIRU HOLDING AG, Lucerne, SWITZERLAND (hereinafter "SWIRU") or any other entity owned, controlled or affiliated with SWIRU, subject to the following terms and conditions:

1. The term of this AGREEMENT shall be from the date hereof until the AIRCRAFT is delivered to SWIRU, or until terminated pursuant to Paragraph 7 below.

2. PEGASUS agrees to pay HALLMARK a sales commission of three quarters of one percent (0.75%) of the sales price paid by SWIRU for the AIRCRAFT purchased by SWIRU from PEGASUS.

3. The sales commission shall be paid by PEGASUS to HALLMARK as follows: (a) a payment of three eighths of one percent (0.375%) of the Aircraft price as set out in the AIRCRAFT purchase agreement in 2004 base year dollars, paid at the full execution of the purchase documentation for the AIRCRAFT by PEGASUS and SWIRU as well as receipt of the required deposit for the AIRCRAFT by PEGASUS, and (b) the remainder to be paid simultaneously upon closing, receipt of payment in full by PEGASUS and physical delivery of the AIRCRAFT to SWIRU, such amount to be calculated based on the final Aircraft price so that the two payments together equal three quarters of one percent (0.75%) of the sales price paid by SWIRU for the AIRCRAFT. For the avoidance of doubt, failure of SWIRU to execute a purchase agreement for the Aircraft and make the required deposit relieves PEGASUS of its obligation to make the initial payment above and failure of SWIRU to accept delivery of the Aircraft relieves PEGASUS of its obligation to make the final payment above.

4. HALLMARK represents and warrants that HALLMARK is not employed and/or affiliated with SWIRU in any manner and is a fully independent third party providing professional services in the normal course of business.

5. HALLMARK agrees that the prospective purchase of the AIRCRAFT is subject to all applicable U.S law, including, but not limited to, the applicable portions of the Foreign Corrupt Practices Act and the Patriot Act. HALLMARK further agrees that the payment of the sales commission to HALLMARK by PEGASUS as stated in Section 2 above is subject to all applicable U.S law, including, but not limited to, the applicable portions of the Foreign Corrupt Practices Act and the Patriot Act.



6.  All expenses for this prospective transaction are for the sole account of the individual parties and neither HALL nor PEGASUS may obligate the other party in any manner without receiving written approval in advance from the other party.

7.  This AGREEMENT remains in effect until the Aircraft is delivered to SWIRU, unless PEGASUS and SWIRU fail to conclude a binding purchase agreement by December 1, 2006 (as that date may be extended by agreement of PEGASUS and SWIRU).  In the event that this AGREEMENT is terminated due to the failure of PEGASUS and SWIRU to conclude a binding purchase agreement as set out in the previous sentence, and if PEGASUS and SWIRU subsequently agree to a binding purchase agreement for the AIRCRAFT within 180 days of such termination, this AGREEMENT will be deemed to be valid and all the rights and obligations of this AGREEMENT will be in effect.

8.  PEGASUS and HALLMARK agree that they will keep confidential the terms of this AGREEMENT and of any resulting purchase.

9.  This Agreement may be executed in separate counterparts and is assignable by PEGASUS to a related party but is not assignable by HALLMARK without the written consent of PEGASUS.

10  Each Party hereby represents and warrants to the other that it has full power and authority to enter into and carry out the terms of this Agreement, and that this Agreement constitutes the legal, valid and binding obligation of such party enforceable in accordance with its terms.

11.  This AGREEMENT shall be governed by the laws of the State of New York without regard to conflicts of law principles and the courts of New York shall have exclusive jurisdiction in all matters.

12.  This AGREEMENT supersedes any and all other agreements between the Parties pertaining in any manner to the subject matter hereof, and contains all of the covenants and agreements between the Parties with respect to said subject matter. Each party to this AGREEMENT acknowledges that no written or oral representations, inducements promises or agreements have been made which are not embodied herein.

AGREED AND ACCEPTED AS OF THE EFFECTIVE DATE

HALLMARK AVIATION LIMITED

BY: _____

NAME: STEPHEN P. HALL

TITLE: PRESIDENT

PEGASUS AVIATION FINANCE COMPANY

BY: _____

NAME: Allen B. Della

TITLE: EVP & COO

# EXHIBIT B



**Hallmark Aviation LIMITED**

4/25/2012

April 25, 2012

Mr. Philip Jackmauh                                Via E-Mail phil.jackmauh@awas.com
AWAS
Head of Business and Legal Services
620 Fifth Avenue, Suite 203
New York, NY 10020

Dear Phil:

As requested, I am writing regarding the recent actions by AWAS and SWIRU HOLDING AG (hereinafter "SWIRU") as they pertain to Boeing 787-8GQ, Serial Number 37066 (hereinafter the "AIRCRAFT").

The AIRCRAFT is subject to a COMMISSION AGREEMENT (hereinafter the "AGREEMENT") dated October 30, 2006 by and between AWAS (as successor to PEGASUS AVIATION FINANCE COMPANY) and HALLMARK AVIATION LIMITED (hereinafter "HALLMARK").

The proposed transaction subject to the AGREEMENT for the sale of the AIRCRAFT has been terminated through the supervening actions of AWAS.

HALLMARK learned of the recent actions by AWAS through the normal course of its business as an independent aircraft brokerage. HALLMARK and AWAS are highly regarded professional organizations, each with a distinctly different market focus. The "About Us" section of the AWAS website states, "AWAS is a global leader in commercial aircraft leasing, with the scale, expertise, and dedication to deliver innovative solutions for our customers around the world." This transaction is an anomaly for AWAS and more ideally suited to the expertise of HALLMARK. "HALLMARK specializes in corporate aircraft sales, acquisitions and consulting, and the purchase, design and management of the modification of Head of State and VVIP aircraft."

Conventional wisdom is that "hindsight is 20/20". With the benefit of timely and effective communication from AWAS, HALLMARK may have been able to either preserve the original transaction or structure a different buyer as we have ready, willing and able prospects for this type of aircraft from our established international clientele.

6069 Watch Chain Way
Columbia, Maryland 21044 USA
Telephone 410 740 0200
Facsimile 410 740 0202

The long history of success by HALLMARK with this type of transaction is unmatched in the aviation brokerage community worldwide. If you check with your Head of Aircraft Trading, Carter White, he will recall that HALLMARK successfully acquired both a Boeing 747SP for the Government of Indonesia and a Boeing 737-300 for PrivatAir, Geneva, Switzerland from Sanwa during his tenure. HALLMARK is the first and only independent broker worldwide to structure a transaction for a Boeing 787.

Section 3 of the AGREEMENT provides for a sales commission of three quarters of one percent (0.75%) to be paid to HALLMARK by AWAS. Under the terms and conditions of the AGREEMENT in Section 3, the sales commission shall be paid to "HALLMARK as follows: (a) a payment of three eighths of one percent (0.375%) of the AIRCRAFT price as set out in the AIRCRAFT purchase agreement in 2004 base year dollars, paid at the full execution of the purchase documentation for the AIRCRAFT by AWAS (PEGASUS) and SWIRU, as well as receipt of the purchase documentation for the AIRCRAFT by AWAS (PEGASUS), and (b) the remainder to be paid simultaneously upon closing, receipt of payment in full by AWAS (PEGASUS) and physical delivery of the AIRCRAFT to SWIRU, such amount to be calculated based on the final AIRCRAFT price so that the two payments together equal three quarters of one percent (0.75%) of the sales price paid by SWIRU for the AIRCRAFT".

The initial sales commission articulated in Section 3(a) was paid in full to HALLMARK by AWAS in November 2007. The supervening actions by AWAS have now accelerated the date for final payment to HALLMARK as articulated in Section 3(b) of the AGREEMENT. The supervening actions of AWAS have frustrated the second requirement of Section 3(b) for "physical delivery of the AIRCRAFT to SWIRU" as this requirement suffers from the "Impossibility of Performance".

Time is of the essence. The full balance of the sales commission is now due and owing to HALLMARK under the terms and conditions of the AGREEMENT. HALLMARK must immediately receive the details from AWAS contained in the AIRCRAFT purchase agreement required to calculate the full balance of the sales commission, as well as timely payment in full from AWAS.

I will be traveling from April 30, 2012 through May 11, 2012 and may be contacted on my cell phone at 410-404-3355 or by e-mail at hallmarkaviation@comcast.net. You may also leave a voicemail at my office phone at 410-740-0200.

Sincerely,

Stephen P. Hall, President
Hallmark Aviation Limited

Mr. Philip Jackmauh
Page 2
April 25, 2012



**Insured Aircraft Title Service, Inc.**

P.O. Box 19527 • Oklahoma City, Oklahoma 73144 • (405) 681-6663
(800) 654-4882

FAX #405-681-9299

12/7/2006

# DEPOSIT CONFIRMATION

## RE: BOEING 787-8.

## TO: MR. ALIREZA ITTIHADIEH

## FROM: KIRK WOFORD

## DECEMBER 7, 2006
## (1)   PAGE

DEAR MR. ITTIHADIEH:

THIS WILL CONFIRM THAT I.A.T.S. HAS THIS DATE RECEIVED INTO
ESCROW AN ADDITIONAL DEPOSIT ON THE ABOVE REFERENCED
AIRCRAFT. THIS DEPOSIT NOW TOTALS $10,000,000.00, WHICH WILL BE
HELD IN ESCROW AND WILL BE CONSIDERED REFUNDABLE PENDING OUR
RECEIPT OF FURTHER INSTRUCTIONS FROM THE DEPOSITOR OR A FULLY
EXECUTED PURCHASE AGREEMENT GOVERNING THE FUNDS HELD IN
ESCROW.

PLEASE FEEL FREE TO CONTACT ME DIRECT AT 800-654-4882 WITH ANY
QUESTIONS OR IF YOU DESIRE ADDITIONAL INFORMATION.

BEST REGARDS,

KIRK WOFORD
PRESIDENT

KLW/

Serving the Aviation Industry for over 40 years

# EXHIBIT C

 6/21/2012

June 21, 2012

Mr. Philip Jackmauh                          Via E-Mail: phil.jackmauh@awas.com
AWAS                                         Hard Copy via U.S. Postal Service
Head of Business and Legal Services
620 Fifth Avenue, Suite 203
New York, NY 10020

Dear Phil:

I am writing to demand full payment of the sales commission due and owing to my company, Hallmark Aviation Limited (hereinafter "HALLMARK"), as previously stated in my letter to you dated April 25, 2012.  Subsequent to the receipt of the letter by AWAS, I personally contacted you again on May 30, 2012 to demand payment again. During that conversation, you stated that no sales commission was due as there was no physical delivery of the B787 Dreamliner to SWIRU as required under the terms of the COMMISION AGREEMENT.  Furthermore, you stated that this was the opinion of the "outside counsel" of AWAS and that you would send me a letter stating the AWAS position.  Three weeks have passed and HALLMARK has not received any written communication and AWAS has yet to articulate a credible reason why the sales commission has not been paid to HALLMARK.  It appears that you are for some reason reticent to create a written record of your position.

AWAS is relying on the lack of physical delivery of the B787 Dreamliner to SWIRU as a defense.  That is not a winning position based on the fact that;(a) AWAS has not suffered any financial loss from the cancellation of the B787 Dreamliner by SWIRU and is probably better off today than if the original transaction had been completed;(b) the supervening actions of AWAS made the requirement of physical delivery impossible;(c) despite the fact that there was no physical delivery, the implied covenant of good faith contract performance is well established under New York law, is incorporated into the Uniform Commercial Code and has been adopted by the American Law Institute in the Restatement (Second) of Contracts for the purpose of preventing one party to a contract from destroying and/or denying the rights of another party to the contract based on the implied covenant of good faith and fair dealing.

6069 Watch Chain Way
Columbia, Maryland 21044 USA
Telephone  410  740  0200
Facsimile  410  740  0202

According to the public record, Boeing currently looses over $100 million U. S. Dollars on the delivery of every B787 Dreamliner produced. (Dreamliner Hits a Milestone, Wall Street Journal, June 8, 2012) and the aggregate losses are "larger than anything in the company's history". Therefore, Boeing sees every cancellation of a B787 Dreamliner order, in the short run, as an opportunity to conserve cash by switching the value of such an order cancellation to a different order for a more profitable model (e.g. B737 or B777).

In the case of the cancellation of twenty-four (24) B787 Dreamliners by China Eastern Airlines Corp. due to a delay in the delivery date (as was the case with the SWIRU delivery), Boeing and China Eastern agreed to change the original order to a comparable value order for B737 aircraft. Bloomberg News reported this transaction in October 2011 and also stated that China Eastern "will pay significantly less than the 2008 catalog price for the B737's and get a certain amount of indemnity from Boeing". As you well know, Boeing does not, in the customary order of business, offer 2008 pricing to buyers in 2011. Other types of discounts, **Y**es. Backdated pricing and added benefits, No.

Most recently, it has been reported that Boeing has settled a claim for $1Billion U. S. Dollars from Air India in compensation for delays in the deliveries of B787 Dreamliners for approximately $500 million U.S. Dollars.

Based on the abundance of evidence in the public record, it is hard to imagine a scenario in which a company such as AWAS did not receive similar beneficial opportunities from Boeing after the cancellation of the B787 Dreamliner order. HALLMARK believes that AWAS first received a cash settlement from SWIRU and subsequently entered into a transaction with Boeing, which included future benefits that provided a higher profit than AWAS would have earned if the original transaction with SWIRU had been completed. So, "but for" the acts of HALLMARK in bringing AWAS and SWIRU together, AWAS would not have been in this windfall position. Therefore, the profits from the original transaction meet or exceed the original amount and AWAS has received a true benefit from the actions of HALLMARK introducing SWIRU to AWAS.

The supervening actions of AWAS, as stated above, have frustrated the requirement of the "physical delivery of the aircraft" to SWIRU and created the impossibility of performance by HALLMARK. The concept of impossibility of performance has continually been broadened and the number of situations where the courts have recognized impossibility as a defense has steadily increased. In New York, the public record is replete with similar cases. The bottom line when supervening impossibility occurs is whether the contractual obligation was discharged. In the instant case, AWAS received the full benefit of the original bargain. It is clear that the lack of physical delivery of the aircraft is moot based on supervening impossibility.

Mr. Philip Jackmauh
Page 2
June 21, 2012

The application of the implied covenant of good faith in New York law mitigates harsh results when one party tries to take advantage of an omission or unanticipated application of express contract terms, thereby breaching the implied covenant of good faith as found in the U.C.C. and the Restatement (Second). The courts have played an increasingly active role in applying and expanding this legal principle. New York courts have been in the forefront, starting with Kirk La Shelle vs. Paul Armstrong Co. in 1933 which held, "In every contract there is an implied covenant that neither party shall do anything which might have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing".

The Kirk La Shelle case is still good law today in New York as evidenced by the decision in 2010 in the District Court in the Southern District of New York in Burton Corp. vs. Shanghai Viquest Precision Industries Co., Ltd. which cited the U. C. C. section 1-304 and addressed a claim for breach of contract based on a party's failure to act in good faith. The burden is on AWAS to prove otherwise and no evidence has been presented.

The record is clear, "but for" the action of HALLMARK in bringing the parties together, AWAS would not have been in the position to profit from Boeing's delay in the manufacture of the B787 Dreamliner, the supervening actions of AWAS have frustrated performance by HALLMARK under the terms of the COMMISSION AGREEMENT and the requirement of the physical delivery of the B787 Dreamliner is therefore moot. The decision of AWAS to deny HALLMARK payment in full runs counter to settled law in New York which routinely applies the implied covenant of good faith and fair dealing to "fill the gap" and prevent unjust enrichment by one contractual party at the expense of the other.

HALLMARK demands immediate payment in full of the sales commission from AWAS, as it has been fully earned by HALLMARK and is owed under the COMMISSION AGREEMENT. HALLMARK demands a true and accurate explanation of the revised transaction and an accounting of the full amount due as well.

Time is of the essence in the full payment of the sales commission. HALLMARK will act decisively to obtain full and favorable receipt of the entire amount.

Contact me in a timely manner on my cell phone at 410 404 3355 or by E-Mail at hallmarkaviation@comcast.net. Since I will be traveling, written correspondence will not be received at my office address for several weeks.

Sincerely,

Stephen P. Hall, President
Hallmark Aviation Limited

Mr. Philip Jackmauh
Page 3
June 21, 2012

# EXHIBIT D

7/10/2012

# PEGASUS AVIATION FINANCE COMPANY

c/o AWAS Aviation Services, Inc.
444 Madison Avenue
4th Floor
New York, New York 10022
(212) 782-3360

Hallmark Aviation Limited,
6069 Watch Chain Way
Columbia, Maryland 21004

Attention: Stephen P. Hall, President.

July 10, 2012

Dear Steve:

Reference is made to the letters of April 25, 2012 and June 21, 2012 sent to Mr. Philip Jackmauh, Head of Business and Legal Services of AWAS, and to the Commission Agreement, dated October 30, 2006 (the "**Agreement**"), between Pegasus Aviation Finance Company, a Delaware corporation ("**Pegasus**"), and Hallmark Aviation Limited, a Maryland corporation ("**Hallmark**") pursuant to which Pegasus agreed to pay to Hallmark a sales commission of three quarters of one per cent. (0.75%) of the sales price "*paid*" by SWIRU Holding AG, a Swiss company ("**Swiru**") for the Boeing 787 Dreamliner aircraft (the "**Aircraft**") to which reference was made in the Agreement.

Pursuant to the terms of clause 3(a) of the Agreement, in early 2008, Pegasus paid US$369,375.00 to Hallmark in satisfaction of its agreement to pay part of the sales commission upon execution of aircraft purchase documentation between Pegasus and Swiru.

Clause 3(b) of the Agreement provided that the remainder of the sales commission was payable by Pegasus "*simultaneously upon closing, receipt of payment in full by Pegasus and physical delivery of the Aircraft to Swiru*". Such conditional nature of the Pegasus obligation to make a second payment of sales commission is further reflected in the agreement between Pegasus and Hallmark set forth in the final sentence of clause 3 of the Agreement that failure of Swiru to accept delivery of the Aircraft would relieve Pegasus of its obligation to make such further payment.

As noted in Hallmark's letter of April 25, 2012, the Agreement was terminated. Contrary to the statement made in such letter that the termination occurred "through the supervening actions of AWAS", the Agreement was terminated as a result of Pegasus having been informed by Swiru that it wished to be relieved of its obligation to purchase the Aircraft pursuant to the Agreement and Pegasus forming the view, based on such request and other

matters, that Swiru would most likely fail to perform its remaining obligations owed to Pegasus under the Agreement and related agreements, and that it was accordingly in the interests of Pegasus to accede to such request by Swiru and thereby terminate Pegasus's future exposure to Swiru risk.

As any further amount of sales commission was payable only in the circumstances mentioned above and as such circumstances will not occur, it is clear that no further amounts are now due and owing, or could become due and owing, by Pegasus to Hallmark under the Agreement. In summary, Pegasus has at all times acted in good faith in relation to the Agreement and has fully performed its obligations thereunder.

Very truly yours.

PEGASUS AVIATION FINANCE COMPANY

By: _____

Name: _____

Title: _E V P_